IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

HENRY ZELAYA

    v.

UNITED STATES OF AMERICA

:

:

:   Civil Action No. DKC 10-2509
    Criminal Case No. DKC 05-0393

:

:

## MEMORANDUM OPINION

Presently pending and ready for resolution is a motion to vacate, set aside, or correct sentence filed by Petitioner Henry Zelaya. (ECF No. 1664). The relevant issues have been briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, the motion will be denied.

## I.  Background

By a superseding indictment filed April 3, 2006, Petitioner Henry Zelaya was charged with conspiracy to participate in racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d). (ECF No. 274).[1] He was appointed counsel under the Criminal Justice Act and, following the denial of pre-trial motions, his case proceeded to trial on March 6, 2007.

---

[1] In opposing Petitioner's motion, the government attaches a fourth superseding indictment, which does not name Petitioner. (ECF No. 1700-1).

At trial, the government established that Petitioner was a member of La Mara Salvatrucha, or MS-13, a criminal organization consisting of approximately 10,000 members worldwide. It presented a succession of witnesses, including experts and numerous gang members, who testified regarding the organizational structure of the enterprise. The evidence showed that MS-13 is organized into a series of groups, called "cliques," that are generally associated with distinct geographical areas and operate under a common set of rules established by international leadership based in El Salvador and Los Angeles.

Petitioner was the founder and leader of a clique based in Prince George's County, Maryland, known as Teclas Locos Salvatruchos ("TLS"). In addition to conducting regular meetings of TLS, collecting dues, maintaining records, enforcing rules, punishing disobedience, coordinating activities with other cliques, and reporting to leaders in El Salvador, Petitioner personally participated in criminal conduct with other TLS members. This conduct included, but was not limited to, the murder of a rival gang member in April 2003; the gang rapes of two teenage girls in May 2003; the armed robbery of a prostitution house in August 2003; and the October 2003 aggravated assault of a man in retaliation of a previous altercation with another MS-13 member. Even while incarcerated,

Petitioner continued to direct the activities of TLS until at least February 2004, when he instructed members as to how leadership responsibilities were to be handled in his absence.

On April 27, 2007, following an eight-week trial, the jury returned a verdict finding Petitioner guilty as charged. He was sentenced on July 30, 2007, to a term of life imprisonment. Petitioner appealed to the United States Court of Appeals for the Fourth Circuit, which affirmed by a *per curiam* opinion issued July 7, 2009, *see United States v. Zelaya*, 336 Fed.Appx. 355 (4th Cir. 2009), and the Supreme Court of the United States denied his petition for writ of *certiorari* on April 5, 2010, *see Zelaya v. United States*, 130 S.Ct. 2341 (2010).[2]

On September 10, 2010, Petitioner, proceeding *pro se*, filed the pending motion pursuant to 28 U.S.C. § 2255, alleging ineffective assistance of counsel and constitutional error in jury selection, in the government's presentation of evidence, and in sentencing. (ECF No. 1664).[3] The government was directed

---

[2] Petitioner erroneously asserts in his motion that his counsel failed to file a petition for writ of *certiorari* on his behalf. (ECF No. 1664 ¶ 6).

[3] The petition mentions a number of other issues in purely conclusory fashion. In several instances, Petitioner alleges that the testimony of various witnesses was "fabricated and prepare[d] by the prosecution to taint [his] image in the mind of the jury." (ECF No. 1664 ¶ 34; *id.* at ¶ 55). He also faults the court for failing to take unspecified corrective action with respect to two jurors, who he asserts were "mocking and laughing every time counsel for petitioner was addressing the court" (*id.*

to respond, and did so on March 1, 2011. (ECF No. 1700).
Petitioner filed reply papers on May 23, 2011. (ECF No. 1718).

## II.  Standard of Review

Title 28 U.S.C. § 2255 requires a petitioner asserting constitutional error to prove by a preponderance of the evidence that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law."  While a *pro se* movant is entitled to have his arguments reviewed with appropriate deference, *see Gordon v. Leeke*, 574 F.2d 1147, 1151–53 (4th Cir. 1978), if the § 2255 motion, along with the files and records of the case, conclusively shows that he is not entitled to relief, a hearing on the motion is unnecessary and the claims raised in the motion may be summarily denied.  *See* 28 U.S.C. § 2255(b).

---

at ¶ 77), providing no citation to the record or corroborative evidence.  Furthermore, he alludes to a violation of the rule of *Brady v. Maryland*, 373 U.S. 83 (1963), but does not identify any exculpatory evidence that was allegedly withheld by the government.  "Such vague and conclusory allegations preclude the [c]ourt from identifying any alleged errors which might have prejudiced Petitioner."  *Tineo v. United States*, 977 F.Supp. 245, 259 (S.D.N.Y. 1996) (emphasis removed) (citing *United States v. Glass*, Nos. 88 Civ. 3756, 87 Cr. 136, 1988 WL 105347, at *3 (N.D.Ill. Sept. 30, 1988)); *see also* Rule 2(c)(2) of the Rules Governing Proceedings under 28 U.S.C. §§ 2254 or 2255 (the petition must "state the facts supporting each ground").  Insofar as Petitioner intended to present these issues as freestanding claims, they will be summarily denied.

4

## III. Analysis

### A.   Ineffective Assistance of Counsel

Claims of ineffective assistance of counsel are governed by the well-settled standard adopted by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). Under the *Strickland* standard, the petitioner must show both that his attorney's performance fell below an objective standard of reasonableness and that he suffered actual prejudice. *See Strickland*, 466 U.S. at 687. To demonstrate actual prejudice, Petitioner must show there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

In the *Strickland* analysis, there exists a strong presumption that counsel's conduct falls within a wide range of reasonably professional conduct, and courts must be highly deferential in scrutinizing counsel's performance. *Strickland*, 466 U.S. at 688–89; *Bunch v. Thompson*, 949 F.2d 1354, 1363 (4th Cir. 1991). Courts must assess the reasonableness of attorney conduct "as of the time their actions occurred, not the conduct's consequences after the fact." *Frye v. Lee*, 235 F.3d 897, 906 (4th Cir. 2000). Furthermore, a determination need not be made concerning an attorney's performance if it is clear that no prejudice could have resulted from some performance deficiency. *See Strickland*, 466 U.S. at 697.

### 1.  Failure to Present Plea Offer

In his initial motion papers, Petitioner faults his trial counsel for failing to communicate to the government that he would accept an offer to plead guilty, rather than proceed to trial, as long as the terms of an agreement did not require him to cooperate.  The government attaches to its response a formal plea offer, dated January 4, 2007 (ECF No. 1700-4), along with the declaration of Petitioner's trial counsel, who asserts that he presented the offer to Petitioner and that it was rejected (ECF Nos. 1700-5).  The plea offer, which appears to comport with the specifications Petitioner allegedly communicated to his counsel (*i.e.*, it does not require his cooperation with the government), essentially proposes a plea to the indictment.[4]  In his reply, Petitioner insists that the offer was never presented to him.[5]

The Supreme Court recently clarified that, "as a general rule, defense counsel has the duty to communicate formal offers

---

[4] Had he accepted the plea offer, Petitioner would have been required to plead guilty to the RICO conspiracy, the first count of the superseding indictment.  (ECF No. 1700-4 ¶ 1).  Petitioner was also named in count thirty-two, alleging conspiracy to commit assaults with a deadly weapon, but that count was later dismissed by the government.

[5] He asserts, however, that another plea offer was presented: "[T]he only offer to plea[d] presented to petitioner was the one which include[d] a cooperation agreement and not the one the prosecution is alleging in its Response.  It was either plead guilty and cooperate[] or go to trial and face a life sentence."  (ECF No. 1718 ¶ 12).

from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Missouri v. Frye*, --- U.S. ----, 132 S.Ct. 1399, 1408 (2012). Any failure in this regard falls below an objective standard of reasonableness and, therefore, constitutes deficient performance under the first prong of *Strickland*. With regard to the second prong, the Court explained:

> To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier offer had they been afforded effective assistance of counsel[;] . . . [that] the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it[;] . . . [and] that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time.

*Id*. at 1409.

Here, assuming that Petitioner's trial counsel did not present the formal plea offer and that Petitioner would have accepted the offer if it had been presented, he cannot establish ineffective assistance of counsel because he fails to demonstrate a reasonable probability that "the end result of the criminal process would have been more favorable." *Frye*, 132 S.Ct. at 1409. Petitioner was sentenced to a term of life imprisonment based, in part, on a determination that his offense

level under the advisory sentencing guidelines was 43.[6]   The formal plea offer attached to the government's response contemplates a guilty plea to the same offense of which Petitioner was convicted after trial and includes a stipulation to an adjusted offense level of 41 – *i.e.*, after a two-level reduction for acceptance of responsibility and one-level reduction for timely notification of intention to plead guilty. (ECF No. 1700-4 ¶ 6).   While the adjusted offense level set forth in the plea offer is two levels lower than the level applied at sentencing, the government expressly reserved the right to seek a role enhancement of up to four levels pursuant to U.S.S.G. § 3B1.1.   (*Id.* at ¶ 8).[7]   At sentencing, upon the

---

[6] An offense level of 43 yielded an advisory guidelines sentence of life imprisonment under any criminal history category. *See* U.S.S.G., ch. 5, pt. A (Nov. 2006).

[7] Section 3B1.1 of the United States Sentencing Guidelines provides:

> Based on the defendant's role in the offense, increase the offense level as follows:
>
> (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
>
> (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was

government's motion and after extensive argument, the court applied a four-level enhancement based on overwhelming evidence of Petitioner's leadership role in the TLS clique.[8]

There is no reason to believe that a role enhancement under § 3B1.1 would not also have applied if Petitioner had accepted the plea offer. Notably, even a minimum two-level enhancement would have resulted in an offense level of 43, which was the same level used to determine Petitioner's guidelines after trial. Indeed, if Petitioner had signed the plea, he would have been required to stipulate to the truth of the attached statement of facts, which reflects, in no uncertain terms, that he was the founder and leader of the TLS clique and that he participated with other gang members in criminal activity, including murder, rape, and aggravated assault. (ECF No. 1700-4, at 8-11). There is simply no view of the evidence that Petitioner did not occupy a leadership position in the enterprise such that a role enhancement would not apply. Consequently, had Petitioner accepted the government's plea

---

otherwise extensive, increase by 3 levels.

(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

[8] The court ultimately determined that Petitioner's offense level was either 46 or 48, but observed that 43 was the highest level on sentencing table. (T. 6/30/07, at 43).

offer, his guideline range would almost certainly have been the same as it was after trial.

"When a defendant would have been subject to the same guideline range notwithstanding counsel's alleged error, the defendant must demonstrate a reasonable probability that, in the absence of the error, the specific sentence would have been lower." *Shaheed v. United States*, Civ. No. 07-1167, Crim. No. 03-71, 2010 WL 3809854, at *6 (W.D.Pa. Sept. 22, 2010) (citing *United States v. Ivory*, No. 09-2376, 2010 WL 1816236, at *3 (D.Kan. Feb. 26, 2010); *Pena-Carrizoza v. United States*, No. 04-475, 2006 WL 2992556, at *4 (D.Utah Oct. 17, 2006)). Petitioner has not, and cannot, make that showing here. Accordingly, his initial claim of ineffective assistance of counsel must fail.

## 2. Failure to Confront Witnesses

Petitioner next alleges ineffective assistance based on his counsel's failure to cross-examine witnesses or to present rebuttal evidence in the manner he suggested at trial. Initially, he asserts that he told counsel that "he was incarcerated in the [c]ounty jail" on the date of the rapes, and that "no affirmative action was taken" in response. (ECF No. 1664 ¶ 30). The government fails to address this claim directly, but the attached declaration indicates that Petitioner's trial counsel has "no memory of the petitioner being in the [c]ounty jail at the time, and . . . no

recollection whatsoever of the petitioner raising this issue" at trial. (ECF No. 1700-5 ¶ 4).

Although there is a dispute of fact regarding whether Petitioner advised his counsel that he, in effect, had an alibi for the date of the rapes, any failure to present such evidence could only constitute ineffective assistance if the alibi was, in fact, true. "In order to obtain an evidentiary hearing on an ineffective assistance claim – or, for that matter, on any claim – a habeas petitioner must come forward with some evidence that the claim might have merit," and "[u]nsupported, conclusory allegations" are not sufficient. *Nickerson v. Lee*, 971 F.2d 1125, 1136 (4th Cir. 1992), *superseded on other grounds by Trest v. Cain*, 522 87 (1997), and *Gray v. Netherland*, 518 U.S. 152 (1996); *see also Lemons v. United States*, No. 7:10-CR-00083, 2013 WL 819731, at *2 (W.D.Va. Mar. 5, 2013) ("A petitioner must do more than make bald assertions regarding the effectiveness of his counsel to prevail on a § 2255 motion") (citing *United States v. Roane*, 378 F.3d 382, 400 (4th Cir. 2005)). Petitioner points to no evidence that he was incarcerated on the date of the rapes, however, and there is overwhelming evidence that he was not. Indeed, four eyewitnesses – the two victims and two co-conspirators – testified at trial that he was an active participant in the rapes and the pre-sentence report, which includes an arrest history, makes no mention of any arrest prior

to August 2003.  By itself, Petitioner's bare allegation that he was incarcerated on the date of the rapes is insufficient to show that he was, in fact, incarcerated.  Thus, he cannot establish any deficiency in his counsel's performance for failing to adduce such evidence at trial.

Petitioner also faults his trial counsel for "refus[ing] to question[]" one of the rape victims as to why "the prosecution ha[d] to bring into evidence a picture, where a red circle was drawn to identify him" when she had testified previously that she "knew [P]etitioner from his school years[.]"  (ECF No. 1664 ¶ 32).  He appears to refer to a photographic array by which the witness identified Petitioner to police as one of her assailants.  (T. 3/20/07, at 135).  Petitioner overlooks that the admissibility of identification evidence was challenged by his counsel prior to trial, albeit unsuccessfully.  Moreover, the witness testified that she knew Petitioner from school; she positively identified him in court; and her account was substantially corroborated by multiple other witnesses. Therefore, no prejudice could have inured to him from the introduction of evidence of her prior identification, and there was little to be gained by counsel challenging the witness in the manner Petitioner now suggests.

Petitioner next contends that his counsel failed to point out "irregularities and contradictory testimony" of a co-

conspirator who witnessed Petitioner's murder of the rival gang member. (ECF No. 1664 ¶ 40). Specifically, he argues that the witness "told [] the jury that[] he heard a gunshot an[d] when he turned saw [P]etitioner pointing the gun and taking a second gunshot at the victim," which was inconsistent with "[t]he results from the crime laboratory show[ing] that the victim had only one gunshot impact[.]" (*Id*. at ¶ 39). This argument simply mischaracterizes the testimony. The witness in question testified that Petitioner "shot [the victim] and he fell to the ground" (T. 3/21/07, at 113), which was entirely consistent with the testimony of the medical examiner, who observed a single gunshot wound to the decedent's head (T. 3/22/07, at 154). Both accounts, moreover, were corroborated by a second co-conspirator, who also witnessed the shooting and testified that Petitioner shot the victim once in the head. (*Id*. at 91).

Petitioner also takes issue with inconsistencies in the testimony of a co-conspirator regarding when he came to the United States from El Salvador and when he met a local gang leader. According to Petitioner, he mentioned these issues to his counsel at trial, but was "completely ignored." (ECF No. 1664 ¶ 52). Here, too, Petitioner's argument is belied by the record, which reflects that counsel thoroughly cross-examined the witness regarding historical inconsistencies in his testimony (T. 4/6/07, at 50-54) and argued vigorously in his

closing argument that the testimony was unreliable for that reason (T. 4/25/07, at 37-39).

### 3. Failure to Investigate

Regarding his involvement in the murder, Petitioner contends that "discovery showed [] there was a witness who declared that he saw the one who shot the victim" and it "was another person[,] not the petitioner." (ECF No. 1664 ¶ 43). He alleges that he "implored counsel to find and interview this witness," but "counsel ignored [him] and never questioned the witness . . . to prove wrong the evidence against him." (*Id.* at ¶ 44). Petitioner's trial counsel, on the other hand, recalls that there was "some discussion of finding a witness to contradict the Government's allegations, but there was no witness to find since there was no identified witness to the crime except [] the co-defendants who testified at trial." (ECF No. 1700-5 ¶ 5). Thus, the parties essentially present conflicting evidence as to whether such a witness was identified in discovery documents. An evidentiary hearing is not necessary to resolve this dispute, however, because even if Petitioner's version of events is credited, he cannot make a sufficient showing of prejudice to establish ineffective assistance of counsel.

At trial, two TLS members testified that, on April 19, 2003, they were seated in a car outside a liquor store in

Langley Park, Maryland, along with Petitioner and two other TLS members. They observed three men walking nearby who appeared to have purchased beer from the store. Petitioner, the leader of the TLS clique, said that one of the men "was a member of VL, which is Vatos Locos," a rival gang. (T. 3/21/07, at 110). Multiple witnesses, including gang members, testified that MS-13 members are obligated to assault, if not murder, rival gang members, called "chavalas," on sight.[9] Consistent with that objective, Petitioner and his colleagues "decided that [they] were going to go and wait for [the rival gang member] at a corner and do something to him, to jump him or hit him." (*Id.* at 111). The group then drove "to a corner of 15th Avenue, and [] parked in a parking lot, and when [they] saw that [the rival group was] coming, . . . [they] all got out [of the car], and [] went over to them." (*Id.*). Three of Petitioner's co-conspirators approached the rival gang member and "started hitting him"; one of them "had a bat." (*Id.* at 112). During the assault, "someone from a building yelled" and the MS-13 group began to return to their car. (*Id.* at 113). As they did, the rival gang member "said that he was going to come back to take revenge." (*Id.*). Petitioner, who was standing nearby,

---

[9] In fact, a female member of MS-13 testified that she was severely beaten by multiple male members of her clique for merely assaulting, rather than murdering, a rival gang member she encountered in the District of Columbia. (T. 3/28/07, at 128-38).

then brandished a gun – which was owned by the TLS clique and used in multiple crimes – and shot the rival member in the head from approximately eight to ten feet away. (*Id*. at 113, 115; T. 3/22/07, at 51-52, 91).

Assuming that a witness reported seeing another individual fire the fatal shot, there is no indication in the record that such witness could have been located by Petitioner's counsel or that he or she would have been willing to testify at trial. Moreover, the only conceivable alternative gunman would have been one of the four TLS members who accompanied Petitioner. Indeed, Petitioner's counsel attempted to implicate one of the testifying co-conspirators as the shooter at trial. Even if it were true that one of the other TLS members pulled the trigger, however, Petitioner could still have been liable for murder as a co-conspirator. *See United States v. Chorman*, 910 F.2d 102, 110-11 (4th Cir. 1990) ("Federal courts consistently have followed *Pinkerton* [*v. United States*, 328 U.S. 640 (1946),] in affirming convictions for substantive offenses committed in the course of and in furtherance of a conspiracy, based on the defendant's knowledge of and participation in that conspiracy"); *United States v. Teran*, 496 Fed.Appx. 287, 294 (4th Cir. 2012) ("A defendant can be found guilty of an offense 'reasonably foreseeable as a necessary or natural consequence of the conspiratorial agreement'" (quoting *United States v. Aramony*, 88

F.3d 1369, 1380 (4th Cir. 1996)). It is undisputed that the decedent was targeted by the TLS group because he was identified by Petitioner, the group's leader, as a chavala. Moreover, it was established that a core tenet of MS-13 membership held that chavalas were to be assaulted or murdered. Thus, the murder in question was entirely foreseeable as part of the MS-13 enterprise, and Petitioner, a primary instigator in the confrontation, could have been liable as a co-conspirator regardless of whether he pulled the trigger.

Against all the evidence to the contrary, Petitioner now purports to have seen a discovery document indicating that an unspecified witness saw "another person" fire the shot. (ECF No. 1664 ¶ 43). If he could be liable as a co-conspirator, however, the fact that another TLS member may have been the shooter would not be likely to alter the outcome of the trial. As noted, to establish his ineffective assistance claim, Petitioner must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Assuming, *arguendo*, that his counsel failed to investigate; that, had he done so, he would have located the exculpatory witness; and that the witness would have been willing to provide exculpatory testimony at trial, Petitioner has not shown a reasonable probability that the jury would have found that

first-degree murder was not among his objectives in the conspiracy. Accordingly, his ineffective assistance claim in this regard cannot prevail.

### 4. Failure to Present Mitigating Evidence

Petitioner further alleges ineffective assistance based on his counsel's "fail[ure] to uncover and present any evidence of[] [his] background from El Salvador" at sentencing. (ECF No. 1664 ¶ 81). Consequently, according to Petitioner, the court "heard almost nothing that would humanize him or allow [it] to accurately gauge his moral culpability." (*Id*. at ¶ 82). This claim is completely at odds with the record, which reflects that counsel filed a sentencing memorandum on July 27, 2007, providing substantial detail of Petitioner's background, attaching childhood photographs of him with family members in El Salvador (ECF No. 1700-9, at 5-6, 9-10), and that he argued extensively at sentencing that Petitioner's age and life circumstances should be considered as mitigating factors (T. 7/30/07, at 59-65). Indeed, the sentencing court "recognize[d] that [Petitioner] was a young person at the time he came to this country . . . and that the circumstances of his youth and upbringing were not ideal," but nevertheless found there was "no excuse for turning to the gang life," and that he did so "not simply as a refuge, but the way he took on that mantra went well

beyond succumbing to necessity." (*Id.* at 67).[10]  The fact that the court was ultimately not persuaded by the argument advanced by his counsel does not provide a basis for Petitioner to impugn his counsel's performance.

## 5.  Trial Preparation

Petitioner also presents two somewhat-related arguments regarding pre-trial interactions with his counsel.  He initially complains that, "[d]uring the pretrial phase[,] counsel kept attacking [him] with questions like[] 'Why did you commit those crimes[?' and] 'How [did] you become number one of that gang?[']" and accused him of committing murder "to show [his] followers how capable [he was] to kill anyone that could be an enemy of the gang."  (ECF No. 1664 ¶¶ 21, 22 (emphasis removed)).  According to Petitioner, this "line of questioning as if [counsel] was a prosecutor, every time [he] visit[ed] [him] at the institution, affected the 'counsel/client' relationship and prejudiced [him by] preventing the necessary communication afforded by the Constitution to prepare for the case."  (*Id.* at ¶ 25 (emphasis removed)).  He further contends that the fact that his counsel did not speak Spanish, Petitioner's native language, "made communication between

---

[10]  As the Fourth Circuit recognized in affirming Petitioner's conviction, the mantra of MS-13, as reported by numerous witnesses at Petitioner's trial, is "'mata, viola, controla,' which means 'kill, rape, control.'" *Zelaya*, 336 Fed.Appx. at 356.

counsel and [P]etitioner almost impossible," and that "[c]ounsel came just once to the visit room with an interpreter[.]" (*Id.* at ¶ 17).

While the interview tactics and language skills of Petitioner's trial counsel may have been less than ideal, these arguments, if true, do not establish that Petitioner was deprived of the right to counsel guaranteed by the Sixth Amendment. Indeed, "[t]he Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003). Aggressive questioning during client interviews could certainly be considered part of a sound trial preparation strategy, and Petitioner has not shown that his attorney's interview methods had any effect on the outcome of the trial. The fact that Petitioner was not appointed Spanish-speaking counsel is more a reflection of the enormous strain the MS-13 trials placed on court resources than of the competence of his counsel, but Petitioner has failed to demonstrate that a language barrier resulted in substantial prejudice. Having complained about the substance of his communications with counsel "every time [he] visit[ed] [him] at the institution" (ECF No. 1664 ¶ 25), Petitioner's argument that he could not understand his counsel is significantly less persuasive. In any event, the record reflects that Petitioner was ably represented by counsel at

trial and Petitioner has not shown how Spanish-speaking counsel would have obtained a different result. Accordingly, his ineffective assistance claims related to pre-trial preparation will be denied.

## B. Jury Selection

Petitioner next contends that, during jury selection, he "requested on various occasions to select Latino descendants to be part of the jury," which was "necessary due to the nature of the RICO charge . . . [that] identified [him] as a leader of a notorious gang from Central America." (ECF No. 1664 ¶ 26). Relying principally on *Batson v. Kentucky*, 476 U.S. 79 (1986), and *Strauder v. West Virginia*, 100 U.S. 303 (1880), he asserts that he was "denied a fair trial when [] all possible jurors from [his] nationality or of South American background" were excluded from the jury. (ECF No. 1664 ¶ 27). The government argues in response that, "[b]ecause all possible Hispanic jurors were stricken for cause from the venire, Petitioner has not presented a cognizable *Batson* claim." (ECF No. 1700, at 8).[11]

In *Batson*, 476 U.S. at 89, the Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the

---

[11] While this claim, among others, would appear to be procedurally defaulted, the government has not raised the issue and the court declines to do so *sua sponte*.

assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *See also Hernandez v. New York*, 500 U.S. 352, 371 (1991) (holding that striking potential jurors on the basis of ethnicity also violates the rule of *Batson*). Petitioner provides no record citation of an instance during jury selection in which any party exercised a peremptory challenge to strike a potential juror of Hispanic descent. Indeed, he does not challenge the government's assertion that all Hispanic members of the venire were struck "for cause," rather than peremptorily. Thus, there could be no *Batson* violation. *See Spencer v. Murray*, 5 F.3d 758, 764 (4th Cir. 1993) ("*Batson* prohibits only the use of discriminatory motives when exercising challenges, nothing more and nothing less.").

The thrust of Petitioner's complaint in this regard appears to be simply that there were no Hispanic members of the jury. In both of the cases cited in his initial motion papers, however, the Supreme Court recognized that a "defendant has no right to a 'petit jury composed in whole or in part of persons of his own race.'" *Batson*, 476 U.S. at 85 (quoting *Strauder*, 100 U.S. at 305). The right guaranteed by the Equal Protection Clause, rather, is that potential jurors sharing a protected characteristic with the defendant – such as race, gender, or ethnicity – may not be excluded from the jury on the basis of

that characteristic.  The record is clear that no such error occurred in this case.  Accordingly, this claim will be denied.

### C.  Confrontation Clause and Evidentiary Rulings

Petitioner further alleges that the government violated the Confrontation Clause of the Sixth Amendment and/or the rule against hearsay by: (1) introducing into evidence a co-conspirator's prior statement to police (ECF No. 1664 ¶ 40); (2) presenting the testimony of gang experts, who provided historical and background information about MS-13 and showed a video depicting "inmates that supposedly run the prisons in El Salvador" (*id.* at ¶¶ 45-46); (3) presenting a police witness who "was questioned about some pictures, which were shown to the jury," containing notations of the gang nicknames of various members (*id.* at ¶¶ 70-71); and (4) introducing into evidence "an[] album that was taken from [P]etitioner" containing pictures of his "family and friends" (*id.* at ¶ 72).  The government addresses only the third argument, along with the admission of the prior identification that Petitioner appeared to raise in the ineffective assistance context, purporting to demonstrate that the evidence was properly admitted under Fed.R.Evid. 801(d)(1)(C).  (ECF No. 1700, at 8-9).

Federal habeas corpus petitioners, however, are limited to claims of constitutional dimension.  *See United States v. Fazzini*, No. 86 CR 1, 97 C 3141, 1998 WL 26161, at *2 (N.D.Ill.

Jan. 21, 1998) ("evidentiary rulings are not proper matters for review in a § 2255 motion") (citing *Williams v. United States*, 365 F.2d 21, 22 (7th Cir. 1966); *Carrillo v. United States*, 332 F.2d 202, 203 (10th Cir. 1964); *United States v. Johnpoll*, 748 F.Supp. 86, 91-92 (S.D.N.Y. 1990)). Thus, Petitioner's claims regarding evidentiary rulings are cognizable only insofar as he alleges violation of his rights under the Confrontation Clause. In *Crawford v. Washington*, 541 U.S. 36, 68 (2004), a case relied upon by Petitioner in his reply papers, the Supreme Court held that the admission of "testimonial" hearsay violates the Confrontation Clause where the declarant is unavailable and the defendant had no prior opportunity for cross-examination. Here, with the exception of the video (which was not testimonial), the declarants were available for cross-examination; thus, the concerns addressed in *Crawford* are not implicated. Accordingly, Petitioner has failed to demonstrate a violation of his rights under the Confrontation Clause.

### D. Eighth Amendment

Prior to sentencing, a dispute arose as to Petitioner's age at the time of the overt acts. While the court credited evidence that his date of birth was November 7, 1984, Petitioner's trial counsel argued that his proper date of birth was in September 1986. At the sentencing hearing, the

government stated that uncertainty about Petitioner's age was a factor in its decision not to charge the rapes as overt acts:

> The reason it wasn't charged for Mr. Zelaya has nothing to do with sufficiency [of the evidence against him]. It had to do with the ongoing confusion about his age. And at the time of that particular incident, the Government was not satisfied [it] could establish that he was of an age of majority.
>
> Now we are satisfied, and we've proven this up through the course of the trial, that his RICO activities straddle whatever his age of majority would be. In other words, that his continued involvement in the gang, even from jail, even writing letters and directing missives to [his girlfriend], all validate an adult prosecution of Mr. Zelaya. But there's been enough confusion and enough different dates of birth used by Mr. Zelaya during police processing to where the Government made a decision [not to] present that as a separate charge. And, again, with the instructions that were used, or I should say the special finding that was made in this case, his exposure is life, regardless of that charging decision.

(T. 7/30/07, at 20-21).

Petitioner now argues that his sentence of life imprisonment runs afoul of the Eighth Amendment's prohibition against cruel and unusual punishment. (ECF No. 1664 ¶ 85). He relies on *Graham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011, 2034 (2010), in which the Supreme Court held that "[t]he Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide." Petitioner, of

course, was found to have committed first-degree murder; thus, his sentence was not unconstitutional under *Graham*.

More recently, after the instant motion was fully briefed, the Supreme Court decided *Miller v. Alabama*, --- U.S. ----, 132 S.Ct. 2455, 2460 (2012), holding that a statutory scheme that calls for a sentence of "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on cruel and unusual punishments" because "such a scheme prevents those meting out punishments from considering a juvenile's lessened culpability and greater capacity for change, and runs afoul of . . . [the] requirement of individualized sentencing for defendants facing the most serious penalties." (Internal marks and citation omitted). Petitioner, however, was sentenced under the advisory sentencing guidelines, not pursuant to a mandatory sentencing scheme. As noted, moreover, the court considered his age and underprivileged background in rendering its sentence. Accordingly, his sentence to life imprisonment was not prohibited by the Eighth Amendment.

### E.  Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing Proceedings under 28 U.S.C. §§ 2254 or 2255, the court is required to issue or deny a certificate of appealability when it enters a final order adverse to the petitioner.  A certificate of appealability

is a "jurisdictional prerequisite" to an appeal from the court's order. *United States v. Hadden*, 475 F.3d 652, 659 (4th Cir. 2007). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where the court denies a petitioner's motion on its merits, a prisoner satisfies this standard by demonstrating that reasonable jurists would find the court's assessment of the constitutional claims debatable or wrong. *See Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where a motion is denied on a procedural ground, a certificate of appealability will not issue unless the petitioner can demonstrate both "(1) that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and (2) that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Rose v. Lee*, 252 F.3d 676, 684 (4th Cir. 2001) (internal marks omitted).

Upon review of the record, the court finds that Petitioner does not satisfy the above standard. Accordingly, it will decline to issue a certificate of appealability.

## IV. Conclusion

For the foregoing reasons, Petitioner's motion to vacate, set aside, or correct sentence will be denied.  A separate order will follow.

```
_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
```